# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-0936V

| | |
|---|---|
| IJEOMA CHUKWUDUM,<br><br>             Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>             Respondent. | Chief Special Master Corcoran<br><br>Filed: March 17, 2025 |

*Sean Frank Greenwood*, Greenwood Law Firm, Houston, TX, for Petitioner.

*Mitchell Jones*, U.S. Department of Justice, Washington, DC, for Respondent.

## **DECISION AWARDING DAMAGES**[1]

On July 31, 2020, Ijeoma Chukwudum filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she sustained a shoulder injury related to vaccine administration ("SIRVA") due to an influenza ("flu") vaccine received on October 13, 2017. Petition (ECF No. 1). The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

I previously concluded that Petitioner had preponderantly established the onset of shoulder pain within 48 hours after vaccination, and all other criteria and requirements for

---

[1] Because this decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

a Table SIRVA claim, and she was thus entitled to compensation. Ruling on Entitlement (ECF No. 51), available at *Chukwudum v. Sec'y of Health & Hum. Servs.*, No. 20-936V, 2023 WL 8112957 (Fed. Cl. Spec. Mstr. Oct. 17, 2023). That decision – including the summary of the previous procedural history, and the evidence – is fully incorporated and relied upon herein especially because the parties have declined to submit any additional evidence, although they did brief the unresolved damages components. Damages Brief filed Dec. 12, 2024 (ECF No. 64); Response filed. 3, 2025 (ECF No. 66); Reply filed Feb. 17, 2025 (ECF No. 67). The matter is now ripe for adjudication.

**For the following reasons, I find that Petitioner is entitled to $130,000.00 for her past pain and suffering, and stipulated past medical expenses –** but no award of future pain and suffering, past lost earnings, or housecleaning costs.

## I. Pain and Suffering

### A. Authority

In another recent decision, I discussed at length the legal standard to be considered in determining SIRVA damages, taking into account prior compensation determinations within SPU. I fully adopt and hereby incorporate my prior discussion in Sections I and II of *Timberlake v. Sec'y of Health & Hum. Servs.*, No. 20-1905V, 2025 WL 721730 at *1 – 3 (Fed. Cl. Spec. Mstr. Feb. 19, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[3]

### B. Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of

---

[3] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Petitioner's injury.

I have reviewed the record as a whole to include the medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

The record establishes that as of October 13, 2017, Petitioner was 37 years old, healthy, and raising three children (approximately 10, 6, and 4 years old) with her husband. Ex. 5 at 50 – 51; Ex. 1 at ¶ 51. She was employed as a pharmacist and received the at-issue vaccination in her left arm, while at work. Ex. 2 at 1.

Overall, Petitioner's SIRVA was moderately severe. It was not documented at two dermatology appointments on November 6 and December 1, 2017. Ex. 13 at 10 – 17. But I previously concluded that those were "not an obvious context" for reporting a shoulder injury. *Chukwudum*, 2023 WL 8112957 at *6. And a later dermatology appointment referenced shoulder pain, but omitted any exam or assessment thereof – confirming that the provider was focused on her separate and unrelated area of specialty. *Id.* Thus, the dermatology encounters do not particularly impact the damages determination.

Petitioner's shoulder injury was documented 49 days post-vaccination, on December 1, 2017, through a complaint to her employer. Ex. 15 at 42. The employer advised that it would manage the medical evaluation of the injury – and the resulting costs. *Id.* The employer arranged an appointment with a physician's assistant ("PA") which took place four days later and resulted in prescriptions for ibuprofen and metaxalone, but the maintenance of Petitioner's regular duties as a pharmacist. *Id.* at 43 – 44, 48 – 52. Those medications and four physical therapy ("PT") sessions later in December 2017 (*see generally* Ex. 4) were not associated with improvement, however.

By January 2018, Petitioner's shoulder injury had worsened, prompting initial evaluation with an orthopedist (affiliated with her employer); a shift to "light" work duties, with no overhead lifting and weightbearing restrictions; several additional oral pain medications, including a Medrol steroid dose pack; and a steroid injection. *See generally* Ex. 15 at 16 – 19; Ex. 6 at 36 - 40. In February 2018, she started occupational therapy ("OT"), Ex. 7 at 9 – 10, and MRIs of the shoulder suggested supraspinatus tearing; subacromial impingement; biceps tendinitis; supraspinatus tendinopathy; and degenerative changes of the superior labrum. Ex. 8 at 3; Ex. 6 at 49 – 50.

3

In spring 2018, Petitioner consulted a second and a third orthopedist (not affiliated with her employer) who each endorsed surgical intervention. Ex. 8 at 1 – 2; Ex. 9 at 16 – 17. In contrast, her original orthopedist (affiliated with her employer) hoped that Petitioner's injury would heal with conservative treatment, including administration of a second steroid injection on April 2, 2018. *See generally* Ex. 6 at 30 – 37.

On April 9, 2018, during her ninth (9th) OT session, Petitioner reported that her shoulder was feeling better since the injection. Ex. 7 at 33. On April 18, 2018, during her 11th OT session and reevaluation, she reported that the injection was wearing off and her pain was becoming more significant, and the therapist concurred that her shoulder remained "severely impaired." *Id.* at 49 – 50. After two more OT sessions in April 2018, Petitioner did not return and was administratively discharged. *Id.* at 44 – 46, 51 – 53. S

In May 2018, Petitioner attended fourteen (14) chiropractic sessions. Ex. 14 at 5 – 11. She also started seeing a pain management specialist (also affiliated with her employer). Ex. 5 at 21 – 24, 43 – 55. Upon starting an interdisciplinary pain rehabilitation program (featuring mobilization, strengthening, and behavior modification) on June 11, 2018, Petitioner's pain ranged from 0 – 10/10. *Id.* at 26. She had "Decreased AROM in her L shoulder: flexion 100-A [active], 115-P [passive]; abduction 40-A, 50-P; extension 10; IR 45; ER 10 (pain with all ranges and compensatory movements." *Id.* After twenty (20) full days in this program, in mid-July 2018, she displayed improvements and was cleared to return to work without restrictions. *Id.* at 6. After six more "after-care" sessions, by July 31, 2018, her pain had decreased to 2 – 6/10. *Id.* at 26. She had: "Increased AROM in her shoulder: flexion 140-A, 150-P; abduction 110-A, 120-P; extension 45; IR 45; ER 40 (pain at end range and compensatory movements with abduction, IR, and IR." *Id.* Petitioner was instructed to continue a home exercise program, and was referred back to her orthopedist for reevaluation. *Id.* at 27.

In September 2018, the orthopedist assessed Petitioner's shoulder as having "improved," but still featuring "persistent" pain and impingement. Ex. 6 at 26. The treater discussed the option of a surgical "decompression and cuff debridement [which] would reduce, but not get rid of the pain entirely." *Id.*

By November 2018, Petitioner's continued home exercises and another Medrol dose pack had not cured her shoulder pain, which had persisted for over a year and still interfered with her quality of life and sleep. *Id.* at 21. She opted for surgery, with an expected recovery time of four months, and expected improvement of her condition by "75 – 80%." Ex. 6 at 21 – 22.

4

In January 2019, the orthopedist performed arthroscopic surgery – specifically, glenohumeral debridement and subacromial decompression. Ex. 17 at 53 – 54. She subsequently attended 12 post-operative PT sessions in January – March 2019, *see generally* Ex. 18, which were punctuated by her orthopedist's administration of another steroid injection "to help quiet the inflammation to facilitate the therapy," and recommendation to "add a little rotator cuff strengthening." Ex. 6 at 11. Through home exercises, she achieved "full" ROM and "minima[l] tender[ness]" by April 2019; was released from weightbearing restrictions in May 2019; and was assessed to be at maximum medical improvement ("MMI") as of June 20, 2019. *Id.* at 3, 5, 7. In recommending ongoing "conditioning" exercises, the orthopedist wrote: "[T]he maintenance of good strength and minimization of load with good body mechanics is critical, and although she is young, and maybe even especially because she is young, she needs to be attentive to this forever." *Id.* at 5.

In February 2022, after a 32-month gap in evaluation or treatment of her left shoulder,[4] Petitioner returned to her orthopedist, who recorded: "She has had a little bit of pain from time to time, but over the last couple of months it has been more sore. She has not had any interval management. She has tried some anti-inflammatories with a partial response." Ex. 19 at 2. A physical examination found "good motion," but positive Hawkins and Neer's tests. *Id.* The orthopedist assessed that Petitioner was dealing with "some recurrent inflammation." *Id.* Petitioner received prescriptions for Medrol and Meloxicam, and agreed to "keeping activities light, hopefully nothing more than 5 pounds." *Id.* She declined a steroid injection or additional formal therapy, and she did not follow up with the orthopedist. *Id.* There are no further treatment records, or other information particularly helpful to assessing Petitioner's ongoing condition.[5]

The above evidence establishes that after her October 2017 vaccination, Petitioner suffered a moderately severe SIRVA for approximately 20 months. After an initial 49-day treatment delay (with two intervening medical encounters for unrelated issues), her injury was documented consistently, and it featured varying pain ratings; moderately restricted ROM; consultations with three different orthopedists; two MRIs; various oral pain medications; three steroid injections; 16 PT sessions; 11 OT sessions; 14 chiropractic

---

[4] Excluding an October 2019 primary care annual exam record, which states in the Review of Systems "L shoulder pain (improving)." Ex. 16 at 14. But this record misspells the orthopedist's name, indicates that a physical exam found full range of motion and full strength in the upper extremities, and did include any relevant assessment or treatment. *Id.* at 14 – 15. Accordingly, the record has little probative value in understanding Petitioner's shoulder's condition after June 2019.

[5] Petitioner's only affidavit was prepared in July 2020. Ex. 1. Her husband also submitted an affidavit (primarily to bolster her onset showing), which only briefly attests that Petitioner's pain and suffering "continu[ed]" up to May 2023. Ex. 25.

5

sessions; an intensive pain management program; and arthroscopic surgery. The injury also disrupted her work as pharmacist, and care of her three children. However, the evidence also establishes that Petitioner's shoulder had substantially recovered by 20 months post-vaccination, at which point she had full ROM and strength and was able to return to her full work duties.

I recognize the orthopedist's opinion that Petitioner's shoulder might not be fully healed after surgery, and that she should work to maintain her strength and stability – but there is insufficient evidence of Petitioner adhering to such an exercise program or suffering any cognizable residual effects beyond mid-2019, as evidenced by the dearth of further medical records. Accordingly, the pain and suffering award will not include a future component despite Petitioner's urging, *see* Damages Brief at 3, 13 (requesting $30,000.00 for future pain and suffering); Response at 18 (opposing any future award). There is simply insufficient objective evidence of an ongoing/permanent deficit.

For her past pain and suffering, Petitioner requests an award of $140,000.00, and Respondent counters with $97,500.00. Respondent's approach is not appropriate, for several reasons. First, he states: "The Court has awarded *$91,000.00* - $110,000.00 in cases involving severe [SIRVAs], usually requiring surgeries, but pain is not always immediately reported." Response at 13 (emphasis added). But he did not cite, nor did I independently identify, any cases at the low end of that spectrum. Instead, the lowest SIRVA surgery cases featured past pain and suffering awards of *$95,000.00* each. And such low awards were for specific reasons not replicated here – such as a five-month initial treatment delay followed by another three-month gap in *Shelton*, 2021 WL 2550093, at *7, and the "periods of little to no pain – as evidenced by some gaps in treatment" in *Shields*, 2024 WL 5261893, at *11 (citing favorably to *Hunt*, 2022 WL 2826662, at *8 – 9).[6] Ms. Chukwudum's documented injury and treatment thereof was much more consistent, thus warranting a higher award.

More interesting is Respondent's acknowledgment of *Davidson*, which involved a treatment delay of six weeks (compared to seven weeks and two intervening encounters in this case). Response at 14.[7] This case had a shorter treatment course (20 months, compared to 30 months in *Davidson*) but it involved higher pain ratings and restrictions of motion, additional imaging and specialist evaluations, more continuous treatment (with

---

[6] *Shelton v. Sec'y of Health & Hum. Servs.*, No. 19-279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021) (awarding $97,500.00 for past pain and suffering); *Shields v. Sec'y of Health & Hum. Servs.*, No. 20-1970V, 2024 WL 5261893 (Fed. Cl. Spec. Mstr. Nov. 26, 2024) ($95,000.00); *Hunt v. Sec'y of Health & Hum. Servs.*, No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022) ($95,000.00).

[7] *Davidson v. Sec'y of Health & Hum. Servs.*, No. 20-1617V, 2024 WL 1152539 (Fed. Cl. Spec. Mstr. Feb. 8, 2024) ($110,000.00).

less relief from steroid injections, and Petitioner attempting various therapies and an intensive pain management program), and more post-operative PT sessions. *Davidson*, 2024 WL 11152539, at *4; *see also* Brief at 6 citing *Reed*, 2019 WL 1222925, at *15 (noting treatment by a pain management specialist).[8]

Also instructive is Petitioner's citation to *Nute*, Brief at 9 – 10,[9] in which an injured party experienced several cortisone injections, 19 PT sessions, arthroscopic surgery featuring subacromial decompression and debridement, as well as impaired functioning with hands-on job tasks (nursing in *Nute*, pharmacology in this case). *Nute* featured a somewhat shorter initial treatment delay of 37 days, but a much shorter treatment course of eleven months, compared to the 20 months here. 2019 WL 6125008, at *11 – 12. And Respondent has not explained why a degenerative labral tear dictates a lower award for Petitioner's SIRVA. Response at 14; *but see, e.g.*, Ex. 6 at 24, 28, 32; Ex. 17 at 53 (orthopedist's characterization of only "minimal" fraying and tendinosis). Like in *Nute*, her surgical intervention primarily comprised of glenohumeral debridement and subacromial decompression.

And again, this case involves very consistent documentation and treatment efforts for the injury (even in the face of Petitioner's employer placing roadblocks in the way of surgical intervention). For the above reasons, plus some recognition of her work disruptions (as discussed further below), I find Ms. Chukwudum is entitled to a past pain and suffering award of **$130,000.00.**

## II.    Past Lost Earnings

The Vaccine Act provides for recovery of "actual and anticipated loss of earnings" for a vaccinee whose "earning capacity is or has been impaired by reason of such person's vaccine-related injury." Section 15(a)(3)(A). But any such award must avoid duplicating for any payment that has been made or can be reasonably expected to be made, "under any State compensation program, under an insurance policy, or under any Federal, or State health benefits program (other than under Title XIX of the Social Security Act"). Section 15(g).

A lost earnings award must also reflect tax deductions that would have occurred. *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523 (1983) (*citing Norfolk & Western R. Co. v. Liepelt*, 444 U.S. 490 (1980); *see e.g., L.J. v. Sec'y of Health & Hum. Servs.*, No.

---

[8] *Reed v. Sec'y of Health & Hum. Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) ($160,000.00).

[9] *Nute v. Sec'y of Health & Hum. Servs.*, No. 18-140V, 2019 WL 6125008 (Fed. Cl. Spec. Mstr. Sept. 6, 2019).

17-959V, 2023 WL 2137946, at *7 (Fed. Cl. Spec. Mstr. Jan. 20, 2023) (in which the parties stipulated that the appropriate offsets for taxes reduced a past lost earnings award from $9,223.80 to $5,681.50).

Lost earnings calculations must be performed 'in accordance with generally recognized principles and projections," Section 15(a)(3)(A), and "in a cautious manner." *Brown v. Sec'y of Health & Hum. Servs.*, No. 00-182V, 2005 WL 2659073, at *6 (Fed. Cl. Spec. Mstr. Sept. 21, 2005). Indeed, the Court of Federal Claims recently cautioned that "the determination of compensation for lost earnings 'in accordance with generally recognized actuarial principles and projections' [will] likely require expert opinion evidence.'" *Dillenbeck v. Sec'y of Health & Hum. Servs.*, 147 Fed. Cl. 131, 139 (2020).

Here, Ms. Chukwudum requests $11,568.16 in past lost wages. Brief at 12. The evidence reflects that her SIRVA did not result in unemployment, but *somewhat* impaired her ability to work as a pharmacist. Ex. 1 at ¶ 8 (explaining that her job required "frequen[t] standing, moving, and bending for prolonged period of time"); Ex. 15 at 33 (reflecting a December 2017 shift to "light duty"); Ex. 21 at 6 (July 2018 return to full work duty); Ex. 6 at 5, 7 (indicating additional work restrictions following the January 2019 surgery).

Petitioner typically worked 80 hours in each two-week pay period, at a rate of $48.50 per hour (sometimes with overtime, at a higher hourly rate). Ex. 21 at 30 – 40 (pay stubs from June – December 2017). But she reduced her hours, coinciding with periods of acute pain and treatment for her SIRVA. *See, e.g.*, Ex. 21 at 24 and Ex. 24 at 1 (reflecting a February 18 – March 3, 2018, pay period with 20.25 hours missed); *accord* Ex. 6 at 36, 38; Ex. 7 at 9 – 10; Ex. 8 at 1 – 3 (orthopedics and therapy records from that period). Additionally, she was excused from work, and paid at a "SafetyNet" reduced hourly rate of $41.23 per hour for twelve weeks of post-surgical recovery. Ex. 21 at 7 – 12; Ex. 24 at 1 – 2 (January - March 2019 pay periods); *accord* Ex. Ex. 6 at 3 – 11; 17 at 53 – 54; Ex. 18 (corresponding medical records). Importantly, there is no apparent alternative explanation for Petitioner's reduced earnings throughout this period.

Thus, Petitioner had made *some* showing of lost earnings – but at the same time, Respondent reasonably questions whether all necessary offsets have been applied. Response at 17. Petitioner only replies that she has "carefully documented, calculated, and checked [the lost earnings claim] or any potential offsets." Reply at 6. But it is unclear whether her workers' compensation coverage was state-supported or entirely privately funded. *See, e.g.*, Ex. 23 at 4 ("Texas Workers' Compensation Work Status Report"). And she only calculated "wages missed," Ex. 24 at 1 – 2, without any likely tax deductions. For those reasons, Petitioner's lost earnings claim is inadequately developed and will be denied. However, in the interests of accomplishing "rough justice" and closing out this

case (which has been pending for nearly five years), the above past pain and suffering award includes recognition of her work disruptions, and has been adjusted upwards accordingly.

## III.   Past Unreimbursed Expenses

A petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation ... determined to be reasonably necessary." Section 15(a)(1)(B). But I have previously declined to award the costs of home cleaning, recognized as a "typical" home maintenance cost, when an individual "has not adequately demonstrated that he [or she] can no longer do any typical tasks associated with cleaning except that it may take longer to complete, or that the circumstances justify a special allowance for this sum." *Grant v. Sec'y of Health & Hum. Servs.*, No. 20-1262V, 2024 WL 940275, at *7 (Fed. Cl. Spec. Mstr. Feb. 9, 2024) (denying home cleaning costs, despite awarding lawn service costs that "more directly implicate[d] the limitations" placed on an individual dealing with residual effects of Guillain-Barré syndrome, as endorsed by the Respondent's expert).

Ms. Chukwudum's damages briefing claims *ongoing* "struggles with essential cleaning because of the inability for anything higher than chest level and cannot carry or hold moderately heavy objects (similar to her work accommodations preventing the same)." She requests reimbursement for home cleaning costs of $60.00 per week for 309 weeks (dating from her January 2019 surgery to her December 2024 opening brief) for a total of $18,540.00. Brief at 13. She did not submit any documentation of actually incurring those costs, as required under Section 15(a)(1)(B)(ii). I also agree with Respondent that there is not evidence of an ongoing injury that would uniquely justify ongoing housecleaning costs. Response at 18 (citing Ex. 6 at 14), *compare Grant*, 2024 WL 940275, at *7. Accordingly, those requested costs are denied.

## Conclusion

For all the reasons discussed above and based on consideration of the entire record, **Petitioner is entitled to damages in the form of $141,097.11 (representing $130,000.00 for past pain and suffering, and $11,097.11 for past unreimbursed medical expenses[10]) to be paid through an ACH deposit to petitioner's**

---

[10] The parties stipulated to the past unreimbursable medical expenses. Brief at 13; Response at 2; *see also* Ex. 22 (supporting documentation).

**counsel's IOLTA account for prompt disbursement.** This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[11]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[11] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.